# Office of Disciplinary Counsel v. Bolno

Disciplinary Board Docket no. 162 D.B. 2000.

To the Honorable Chief Justice and Justices of the Supreme Court of Pennsylvania:

WRIGHT JR., *Member,* December 16, 2002—Pursuant to Rule 208(d)(2)(iii) of the Pennsylvania Rules of Disciplinary Enforcement, the Disciplinary Board of the Supreme Court of Pennsylvania herewith submits its findings and recommendations to your honorable court with respect to the above-captioned petition for discipline.

## I. HISTORY OF PROCEEDINGS

On December 22, 2000, petitioner, Office of Disciplinary Counsel, filed a petition for discipline against Susan Bell Bolno, respondent in these proceedings. The petition charged respondent with violation of the Pennsylvania Rules of Professional Conduct and Pennsylvania Rules of Disciplinary Enforcement arising from allegations of client neglect in four matters and misstatements on her Attorney's Annual Fee Form. Respondent filed an answer to petition for discipline on June 22, 2001.

A disciplinary hearing was held on September 26, 2001, before Hearing Committee 1.14 comprised of Chair James P. Becker, Esquire, Member Mary Frances Ryan, Esquire, and Alternate Member Eugene David McGurk Jr., Esquire. Following briefing by the parties, the committee filed a report on February 25, 2002 and found that respondent violated the Rules of Professional Conduct as charged in the petition for discipline. The com-

mittee recommended that respondent receive a suspension for a period of six months, followed by a six-month probation period.

Petitioner filed a brief on exceptions on March 18, 2002. Respondent filed a brief opposing exceptions on May 6, 2002.

This matter was adjudicated by the Disciplinary Board at the meeting of June 12, 2002.

## II. FINDINGS OF FACT

The board makes the following findings of fact:

(1) Petitioner, whose principal office is situated at Suite 3710, One Oxford Centre, Pittsburgh, Pennsylvania, is invested, pursuant to Rule 207 of the Pennsylvania Rules of Disciplinary Enforcement, with the power and duty to investigate all matters involving alleged misconduct of any attorney admitted to practice law in the Commonwealth of Pennsylvania and to prosecute all disciplinary proceedings brought in accordance with the various provisions of said Rules of Disciplinary Enforcement.

(2) Respondent was born in 1947 and was admitted to practice law in Pennsylvania in 1978. Her attorney registration address is 1420 Walnut Street, Suite 1012, Philadelphia, PA 19102. Respondent is subject to the disciplinary jurisdiction of the Disciplinary Board of the Supreme Court.

*Charge I: Complaint of Julie Warman*

(3) In September 1991, Julie and Rex Warman, then residents of Sunbury, PA, were involved in an accident in Arizona, when the tractor-trailer which Mr. Warman was driving in the course of his employment by United

Van Lines, in which Mrs. Warman was a passenger, collided with a vehicle driven by Randy Weedman and owned by Walter Weedman, residents of Arizona.

(4) As a result of the accident, Randy Weedman was killed, Mr. Warman suffered minor injuries, and Mrs. Warman suffered serious injuries.

(5) At the time of the accident:

(a) The Warmans' personal vehicle carried un/underinsured motorist (UIM) and Personal Injury Protection (PIP) coverage under a State Farm Insurance Company policy issued in Florida.

(b) Pennsylvania Manufacturers Association Insurance Company (PMA) insured the United Van Lines vehicle which was insured for first- and third-party and UIM claims and provided workers' compensation coverage to United Van Lines.

(c) The Weedman vehicle was insured by Farmers Insurance in Arizona.

(d) Mrs. Warman was not employed.

(6) Thereafter, the Warmans sought representation in claims arising from the accident.

(7) In or about September 1991, the Warmans retained Brent E. Corwin, Esquire, an Arizona attorney, to represent them in their first- and third-party claims against the Weedmans.

(a) Mr. Warman retained Steven Gring, Esquire, a Wyomissing, PA, attorney, to represent him in his workers' compensation claims.

(b) In an action brought by Randy Weedman's estate against Mr. Warman in Arizona, Mr. Warman was represented by Julie Walsh, Esquire.

(8) Mr. Corwin settled the Warmans' claims against Farmers Insurance for policy limits.

(9) In or about July 1993, Mr. Corwin referred to respondent, and respondent accepted, the representation of the Warmans in first-party medical and wage loss, bad faith, and UIM claims against PMA.

(a) In or about August 1993, respondent entered into contingent fee agreements with the Warmans.

(b) In October 1993, Mr. Corwin communicated with respondent concerning to the UIM claim.

(c) By a telephone conversation and letters sent in November 1993, respondent advised Mr. Corwin and the Warmans of her intention to communicate with Mr. Gring and Ms. Walsh and to file suit against PMA for payment of medical bills, interest, attorney's fees, and bad faith.

(10) In November 1993, respondent forwarded to Mrs. Warman a complaint for PIP benefits and asked for any corrections.

(11) In November 1993, respondent communicated with John Casillas, claims specialist for State Farm in Arizona, who was handling the Warmans UIM and first-party benefit claims.

(12) In January 1994, respondent filed a civil action in the Philadelphia Court of Common Pleas, captioned *Julie Warman v. Pennsylvania Manufacturers Assoc. Insurance Company* (the Philadelphia PMA suit), including claims for first-party benefits and bad faith.

(13) PMA was represented in that litigation by Gary A. Deutsch, Esquire and Kathleen Loughhead, Esquire, of Duane Morris & Heckscher LLP (Duane Morris).

(14) In March 1994, respondent advised Mrs. Warman of the status of the Philadelphia PMA suit and stated that

she was in process of identifying arbitrators for the UIM claim.

(15) In April 1994, respondent communicated with Mr. Deutsch concerning settlement of the case; respondent made a demand for $18,496.75, and Mr. Deutsch demanded wage loss confirmation.

(a) In April 1994, respondent wrote to Mrs. Warman and to Mr. Corwin to request documentation of the wage loss claim.

(b) By letter dated April 13, 1994, Mr. Corwin advised respondent of the basis for the wage loss claim, asked for clarification concerning medical payments issues, and offered assistance to respondent.

(c) By letter dated June 30, 1994, Mr. Corwin asked that respondent advise him of the status of the matter.

(d) By letter dated August 2, 1994, Ms. Loughhead reminded respondent that respondent had not answered recent telephone calls, asked for an employment verification form, and advised that the $18,496.75 settlement offer was open until August 8.

(e) By letter dated August 8, 1994, respondent advised Mrs. Warman that she was unable to prove her wage loss claim based upon the documentation she had supplied and asked for clarification.

(f) By letters dated November 11, 1994, and January 3, 17, and 27, July 10, and October 13 and 31, 1995, Mr. Corwin asked that respondent communicate with him concerning the status of the Warman matters.

(16) By letter dated February 14, 1994, Mr. Casillas asked that respondent advise of the status of the UIM claim.

(a) Respondent did not respond to that letter or to follow-up correspondence of April 22 and June 24, 1994.

(b) In about August 1994, Mr. Casillas spoke with respondent, at which time she advised him that PMA had agreed to pay policy limits on Mrs. Warman's claim, and that she would follow up with information on Mr. Warman's claim.

(c) By letters dated November 8, 1994 and October 25, 1995, and a telephone call of September 20, 1995, Mr. Casillas asked that respondent advise him of the status of the matter.

(17) Other than the communications of August 1994, respondent failed to respond to those calls and letters and to advise the Warmans, Mr. Corwin, State Farm and Mr. Casillas of the status of the Warmans' matters.

(18) Respondent did not advise PMA of her proposed UIM arbitrator until December 1995.

(19) In the Philadelphia PMA suit:

(a) On January 11, 1995, Ms. Loughhead filed defendant's answer to the complaint with new matter.

(b) Respondent failed to respond to the new matter.

(c) By letter dated March 15, 1995, Ms. Loughhead forwarded to respondent a general release in the amount of $15,000, exclusive of wage loss, to be signed by Mrs. Warman.

(d) By letter dated August 3, 1995, Ms. Loughhead reminded respondent that she had sent a release in March 1995, and that respondent had not communicated since that date.

(e) By letter dated October 17, 1995, Ms. Loughhead forwarded to respondent a motion for entry of judgment

in favor of defendant, to which a response was due on November 16, 1995.

(f) On November 16, 1995, respondent filed plaintiff's answer contra motion of defendant for entry of judgment, to which she appended her unexecuted verification.

(g) By letter to the motion court dated November 21, 1995, respondent re-filed the reply and stated that the previous filing did not include the correct documents.

(20) By letter dated December 11, 1995, respondent advised the Lemoyne, PA, office of PMA Group, of her representation of the Warmans in their UIM claims, named a Philadelphia attorney as claimants' arbitrator, and asked that PMA identify its arbitrator.

(a) Respondent prepared but did not file a petition for appointment of arbitrator captioned in the Philadelphia Court of Common Pleas.

(b) By letter dated January 31, 1996, Ms. Loughhead acknowledged that letter.

(c) By letter dated March 11, 1996, John L. Aris, Esquire, of Duane Morris, counsel for PMA in the UIM matter, advised respondent that pursuant to the PMA policy, the arbitration was to be held in Northumberland County.

(d) Respondent failed to pursue the UIM arbitration in either Philadelphia or Northumberland County.

(21) In March 1996, respondent advised Mr. Casillas that Mrs. Warman's PIP claim had been resolved, respondent was deciding whether to pursue arbitration or suit on the PMA UIM claim, and she would advise him shortly as to whether the State Farm excess policy would be involved.

(22) In the Philadelphia PMA litigation:

(a) On January 5, 1996, Ms. Loughhead filed a motion for entry of judgment in favor of defendant for plaintiff's failure to answer PMA's new matter.

(b) On January 22, 1996, Ms. Loughhead noticed Mrs. Warman's deposition with respect to the wage loss claim for February 8, 1996.

(c) In a telephone conversation on February 7, 1996, respondent represented to Ms. Loughhead that she would forward a signed release to settle the litigation, without the wage loss claim.

(d) Respondent did not forward a release to Mrs. Warman at that time and did not provide a signed release to Ms. Loughhead.

(e) By order dated February 16, 1996, the motion for entry of judgment was granted in part, and Count II of the complaint was stricken.

(f) By letter dated February 28, 1996, Ms. Loughhead notified respondent that unless she agreed to reschedule the deposition by March 7, 1996, a hearing date would be set for presentation of a motion to compel deposition, which she enclosed.

(g) Respondent failed to respond.

(h) On April 1, 1996, Ms. Loughhead presented to the court a motion to compel appearance of plaintiff Julie Warman at deposition, which was granted by order of that date which directed Mrs. Warman to appear at deposition on or before May 6, 1996.

(i) By letter dated April 15, 1996, Ms. Loughhead forwarded that order to respondent.

(j) Respondent failed to produce Mrs. Warman for deposition as ordered.

(k) On May 23, 1996, Ms. Loughhead presented a motion for sanctions against plaintiff for failure to attend a deposition, which was granted by an order of that date by which plaintiff was ordered to pay defendant a counsel fee of $150.

(l) By letter dated May 23, 1996, Ms. Loughhead forwarded that order to respondent.

(23) Respondent failed to advise Mrs. Warman, Mr. Corwin or Mr. Casillas at or subsequent thereto of these events.

(24) By letter to Mr. Corwin dated July 19, 1996 (exhibit P-55), respondent, inter alia:

(a) advised that she had been unavailable to be reached by telephone;

(b) explained that the PMA claim for PIP benefits had settled for $15,000;

(c) stated that she had sent a release for a $15,000 settlement to Mrs. Warman on several occasions and that Mrs. Warman had not returned it;

(d) stated that she had prepared a petition to compel arbitration on the UIM claim in Philadelphia County, but that the company insisted that venue lay in the county in which the Warmans and the policyholder had resided at the time of the accident, and that the case was in progress; and

(e) advised that she would contact him the following week to discuss the matter.

(25) On July 25, 1996, a conference call was held among respondent, Mr. Corwin and Mrs. Warman, at which time:

(a) Respondent advised that the court had determined the bad faith suit filed against PMA to be "unfounded";

the UIM arbitration case was still open; the PIP case had settled for $15,000; and a release had been sent to Mrs. Warman on three previous occasions.

(b) Mr. Corwin asked that respondent immediately send copies of those letters to him.

(26) By letter dated July 26, 1996, respondent forwarded to Mr. Corwin copies of the complaint and the release in the Philadelphia PMA suit.

(27) In the Philadelphia PMA suit:

(a) On August 19, 1996, a judgment of non pros was entered subject to plaintiff's appearance for a deposition within eight days, and sanctions of $200 were imposed; and Ms. Loughhead forwarded the order to respondent.

(b) By letter to Ms. Loughhead dated August 27, 1996, respondent confirmed a conversation of that date in which respondent had advised that the wage loss claim would not be pursued and that there was an open offer for the policy limits on the medical bills.

(28) By letter to Mr. Corwin dated August 27, 1996, respondent:

(a) forwarded copies of letters addressed to Mrs. Warman dated August 3, October 13 and November 13, 1995 and April 8, 1996, and a general release of PMA for $15,000 which respondent stated that she had previously sent to Mrs. Warman;

(b) explained that she had not produced Mrs. Warman for deposition on the wage loss issue because Mrs. Warman had provided no evidence of that claim; and

(c) asked that Mr. Corwin discuss with Mrs. Warman dropping that claim so that the medical benefits portion of the claim could be settled.

(29) Mrs. Warman did not receive those letters and releases prior to August 27, 1996.

(30) Respondent fabricated the above letters in order to provide them to Attorney Corwin. Respondent never sent them to Mrs. Warman.

(31) On September 4, 1996, Mr. Corwin initiated another conference call with respondent and Mrs. Warman, which he confirmed by letter dated September 5, 1996, during which call:

(a) Respondent advised that the UIM arbitration proceedings were still pending.

(b) Mrs. Warman agreed to accept $10,000 [sic] for the PIP medical benefit, for which respondent stated that she would forward an appropriate release.

(c) Respondent stated that she had contacted a Florida lawyer to file suit to protect the statute of limitations for the filing of a UIM claim against the Warmans' Florida State Farm policy.

(32) Respondent did not send a release to Mrs. Warman until October 3, 1996.

(33) On August 13 and September 4, 1996, Mr. Casillas called respondent and left messages requesting return calls.

(a) By letter dated August 16, 1996, Mr. Casillas advised respondent that the Florida statute of limitations for claims by Mr. Warman under the State Farm policy would run on September 11, 1996.

(b) Respondent did not respond to Mr. Casillas.

(34) By letter dated September 11, 1996, Mr. Corwin confirmed that respondent had advised that she was aware of and would protect the statute of limitations for the UIM claim for the Florida State Farm policy.

(35) In early September 1996, respondent contacted the Orlando, Florida firm of Rogers, Dowling, Fleming & Coleman, P.A. (the Rogers firm), and asked that the firm file suit in Florida on behalf of the Warmans against State Farm to preserve the statute of limitations on that claim.

(a) By fax transmissions and a letter sent on September 10, 1996, respondent forwarded to the Rogers firm necessary information and asked that they immediately file a complaint or request for arbitration for excess PIP and UIM coverage under the Warmans' State Farm policy, as well as a check in the amount of $200 to cover initial costs and offered to pay additional costs as they arose.

(b) On September 11, 1996, the Rogers firm filed suit on behalf of the Warmans against State Farm in Florida.

(36) In the Philadelphia PMA suit:

(a) By letter dated September 19, 1996, transmitted by facsimile, Ms. Loughhead advised respondent that she intended to file a praecipe to enter the order of judgment of non pros on September 20, 1996.

(b) By facsimile transmission dated September 26, 1996, in response to a telephone message from respondent, Ms. Loughhead forwarded a release for Mrs. Warman's signature, to be returned by October 7, 1996, to avoid filing of the order of non pros.

(c) By order dated October 3, 1996, a judgment of non pros was entered for plaintiff's failure to appear for depositions.

(d) By letter dated October 3, 1996, respondent forwarded to Mrs. Warman a general release for $15,000, on which respondent had limited the claims released by handwriting thereon "concerning payment of wage loss

and/or medical bills under policy coverage for 'no fault benefits.' "

(e) Mrs. Warman returned the executed release to respondent.

(f) By letter dated October 7, 1996, Ms. Loughhead forwarded to respondent a copy of a praecipe to file order of judgment of non pros.

(37) Thereafter, respondent ceased communicating with the Warmans and Mr. Corwin and failed to respond to their letters and telephone calls.

(38) With respect to the Florida State Farm suit:

(a) In November 1996, the Rogers firm forwarded to respondent a copy of State Farm's motion to dismiss for failure to prosecute in the Florida State Farm suit and asked that respondent contact them to discuss the matter.

(b) By fax dated November 22, 1996, the Rogers firm forwarded to respondent another copy of the motion to dismiss and asked that respondent contact them to discuss the matter.

(c) Respondent called the Rogers firm in response to that fax but did not provide the necessary information.

(d) On December 6, 1996, the Rogers firm sent to respondent a bill for $376.83.

(e) Respondent failed to pay the outstanding bill and to communicate further with the Rogers firm.

(f) As a result of respondent's failure to communicate, the Rogers firm was unable to respond to the motion to dismiss.

(g) By letter dated September 17, 1997, the Rogers firm reminded respondent of its outstanding bill for $493.95.

(h) Respondent did not pay that bill.

(i) By order dated February 23, 1998, the Florida State Farm suit was dismissed for failure to prosecute, and respondent was so notified.

(39) In or about 1997, respondent moved her office to One Montgomery Plaza, Norristown, PA, without notice to Mrs. Warman, Mr. Corwin or Mr. Casillas, and thereafter failed to respond to correspondence from various parties interested in the Warman case, including:

(a) letters dated February 4, April 2, and August 28, 1997, from Mr. Corwin requesting that she contact him concerning the status of the Warmans' matters; the August 1997 letter, addressed to respondent at both her Pennsylvania and New Jersey addresses, was returned to Mr. Corwin with a stamp by the post office stating "moved— left no forwarding address;"

(b) letters dated April 14 and May 20, 1998, from Anthony T. Verwey, Disciplinary Counsel, asking that respondent contact him concerning the complaint of Mrs. Warman;

(c) an August 1998 telephone call from the Phoenix, Arizona office of State Farm requesting a return call;

(d) August 1998 letters from Mr. and Mrs. Warman requesting that respondent transfer their files to Mr. Gring; and

(e) letters dated September 3 and October 2, 1998, from Mr. Gring requesting that respondent forward Mrs. Warman's file to him so that he could determine whether he would assume representation of her in the first-party and UIM claims.

*Charge II: Complaint of Michelle Nissenbaum Law*

(40) In or about July 1994, Michelle Nissenbaum (now Law), entered into a contingent fee agreement with respondent for representation in claims arising from a motor vehicle accident which took place in April 1994, in which the other party was Bruce Horwitz.

(41) Mr. Horwitz was insured by State Farm Insurance Company (State Farm).

(42) In August 1994, respondent assumed representation of Mrs. Law in a suit pending in Philadelphia County captioned *Michelle Nissenbaurn v. Bruce Horwitz;* the case was removed to Montgomery County in April 1995.

(43) On June 27, 1997, an award of arbitrators was entered, finding for plaintiff by agreement in the amount of $30,000.

(44) By letter dated July 25, 1997, respondent forwarded to State Farm's counsel an executed release and an executed order to settle, discontinue and end.

(45) By letters dated July 28 and 30, 1997, counsel for State Farm acknowledged receipt of the release and an order and transmitted to respondent a check issued by State Farm in the amount of $30,000, payable to "Michelle Nissenbaum and Susan B. Bolno, her attorney."

(46) Respondent secured Mrs. Law's endorsement of the check and caused it to be deposited to the IOLTA account of the law firm Fox & Fox, with whom respondent had a professional relationship.

(47) Respondent did not request that Fox & Fox distribute any portion of the proceeds to her client and third

parties entitled to receive them until in or about December 1997.

(48) On December 20, 1997, respondent obtained Mrs. Law's signature on a recapitulation, pursuant to which, inter alia, Mrs. Law received $15,300.50, and $5,000 was to be held in escrow for payment of medical bills.

(a) Respondent advised Mrs. Law that she would attempt to negotiate a compromise of any outstanding bills, which to respondent's knowledge at the time amounted to approximately $3,000.

(b) A settlement check in the amount of $15,300.50 was issued to Mrs. Law by Fox & Fox.

(c) Mrs. Law provided respondent with her outstanding medical bills.

(d) On April 22, 1998, Fox & Fox issued a check on its IOLTA account in the amount of $2,000 to Dr. Barry Schwartzman, one of Mrs. Law's medical providers.

(e) Respondent did not promptly determine the existence and amounts of other outstanding bills, compromise and/or pay the bills, or cause distribution of the balance to Mrs. Law.

(49) In May 1998, Mrs. Law moved to Georgia and advised respondent of her new address and telephone number.

(a) Commencing in about October 1998 and continuing through October 1999, Mrs. Law and her husband called respondent on approximately twelve occasions at respondent's Philadelphia and Norristown telephone numbers to inquire about the status of the escrow funds and left messages on her answering machines requesting a return call.

(b) Initially, respondent returned Mrs. Law's calls and advised her that she was waiting to hear from the medical providers about a compromise of their claims.

(c) Thereafter, respondent failed to respond to those calls.

(50) By letter dated October 28, 1998, copied to Michelle Nissenbaum, respondent contacted one of Mrs. Law's medical providers concerning an apparently outstanding bill.

(51) By certified letter dated January 3, 2000, received by respondent's agent, Mr. Law asked that respondent provide an accounting and distribution of the escrow funds, copies of cancelled checks to providers, and a copy of the settlement check to complainant.

(52) By letter dated January 10, 2000, respondent advised Mrs. Law that respondent had tried to reach her by telephone but did not have a valid number; stated that the settlement check had been deposited into the Fox & Fox account; forwarded a summary of bills; stated that she had heard nothing about any bills after October, 1998; and stated that she had requested a current statement of medical bills paid from Prudential, Mrs. Law's first-party carrier.

(53) On January 11, 2000, as a result of a contact by petitioner, Fox & Fox issued a check to Mrs. Law in the amount of $3,000.

(54) By e-mail dated January 12, 2000, Mrs. Law acknowledged receipt of a letter from respondent and inquired about her funds.

(55) By e-mail dated January 12, 2000, respondent advised Mrs. Law that she expected that the matter would be resolved within two weeks.

(56) By letter dated January 17, 2000, respondent provided a breakdown of Mrs. Law's medical expenses; again advised Mrs. Law that she had requested a printout from Prudential; she also stated that Fox & Fox had paid one provider $2,000 and would forward the $3,000 balance to Mrs. Law.

(57) By letter dated February 3, 2000, respondent provided to Mrs. Law a fax from Prudential of that date listing Mrs. Law's paid medical expenses, and stated that "some of these bills appear to have been compromised."

### *Charge III: Complaint of Jacinto A. Rosa*

(58) In October 1996, Jacinto Rosa retained respondent to pursue a divorce from his wife, Christine McNamee Rosa.

(a) By letter dated October 1, 1998, respondent sent to Mr. Rosa a fee agreement which provided that her retainer for the representation would be $1,500, against an hourly rate of $200, and stated that she would advise him of time used and costs.

(b) On October 11, 1996, Mr. Rosa paid respondent $1,500 by check.

(c) Respondent negotiated the check.

(59) By letter dated December 12, 1996, respondent forwarded to Mr. Rosa a draft property settlement agreement.

(a) By letter dated January 14, 1997, Mr. Rosa returned to respondent an edited draft of the agreement and advised her of action he had taken to carry out the agreement.

(b) By letter dated April 8, 1997, respondent forwarded to Mr. Rosa a complaint in divorce for his verification

and a statement of account which showed no payment due.

(c) Mr. Rosa returned the executed verification.

(d) Respondent failed to promptly file the complaint.

(60) On numerous occasions in 1997, Mrs. Rosa called respondent to ascertain the status of the divorce.

(a) On most occasions respondent did not accept or return those calls.

(b) On a few occasions respondent told Mrs. Rosa that respondent had sent documents to her, and Mrs. Rosa advised that she had not received them.

(c) In November 1997, respondent forwarded to Mr. Rosa a copy of a letter to Mrs. Rosa dated November 3, 1997, marked "resent November 8, 1997," which stated that respondent was forwarding the complaint in divorce to Mrs. Rosa and which enclosed a notice to defend which did not include a court term and docket number.

(d) By letter to Mrs. Rosa dated November 24, 1997, copied to Mr. Rosa, respondent stated that she had not received a return receipt card for service of the divorce complaint and asked that Mrs. Rosa execute and return an acceptance of service.

(e) Mrs. Rosa promptly returned the signed acceptance of service.

(f) As of the date of the letter, respondent had not filed the complaint and did not do so thereafter.

(61) On February 17, 1998, Mrs. Rosa called respondent to request the case number, date and location of filing of the complaint.

(a) By facsimile transmission dated March 3, 1998, Mr. Rosa requested that respondent respond to Mrs.

Rosa's inquiries, advised that Mrs. Rosa had found no record of any divorce filing in Philadelphia, and asked that respondent provide the docket information to Mrs. Rosa.

(b) In a telephone conversation on or about March 3, 1998, respondent advised Mrs. Rosa that the divorce would be completed in about 60 days.

(c) That statement was misleading, in that the divorce action had never been filed, and respondent was aware of that fact.

(d) By letter dated April 8, 1998, Mr. Rosa requested that respondent advise of the status of the matter.

(e) In April 1998, Mrs. Rosa and Mr. Rosa each called respondent, who advised each of them that the divorce would be completed in about 45 days.

(f) Respondent knew that those statements were misleading, in that no divorce action had been filed.

(62) In or about 1998, respondent moved her office, but failed to provide Mr. Rosa with her new address.

(63) By facsimile transmission dated May 29, 1998, Mr. Rosa asked that respondent advise whether he was yet divorced.

(a) On June 1, 1998, respondent called Mr. Rosa and stated that the matter would take another 20 days.

(b) Respondent knew that that statement was misleading, in that she had not filed a divorce action.

(c) By facsimile transmissions dated June 11 and July 12, 1998, Mr. Rosa requested that respondent provide the docket number of his case.

(d) Respondent did not respond to Mr. Rosa.

(64) Mrs. Rosa retained her own attorney, who filed the divorce action in August and secured the divorce decree in September 1998.

(65) By letters dated October 10 and November 3, 1998 [letter of September 11 re-mailed], Mr. Rosa advised respondent that the divorce had been granted and asked that she refund the unearned portion of his fee.

(66) Respondent failed to respond to Mr. Rosa's requests.

## Charge IV: Complaint of Gwendolyn Smith

(67) In or about December 1998, Mrs. Smith retained respondent to represent her in a pending divorce action, in which an order approving grounds had been entered, and the record sent to the permanent master in divorce for determination of economic claims.

(a) Respondent advised Mrs. Smith that her retainer would be $500, and that she would bill her after the retainer was expended.

(b) Mrs. Smith paid respondent $500 by check issued in December 1998.

(68) Respondent received from Mrs. Smith's prior counsel the file, which included a notice of hearing dated October 27, 1998, scheduling a hearing for January 28, 1999, which respondent signed.

(69) On December 30, 1998, respondent entered her appearance in the case.

(70) Respondent forwarded to Mrs. Smith a billing statement dated January 1999, showing an hourly rate of $125 and a balance due of $62.50, after credit for the retainer.

(71) By letter to Court of Common Pleas Master Anthony T. Vanore dated January 20, 1999, respondent requested a continuance of a scheduled January 28, 1999 hearing so that she could complete asset valuation documentation.

(a) By notice to counsel dated January 29, 1999, the master's hearing was rescheduled for April 16, 1999.

(b) By letters dated February 7, 1998 and March 27, 1998, respondent advised Mrs. Smith of the hearing date and other matters concerning her case.

(72) Respondent forwarded to Mrs. Smith a billing statement dated March 1999, showing a balance due of $187.50, of which Mrs. Smith paid respondent a total of $137.50 in March and April 1999.

(73) On April 13, 1999, Domenic Masciantonio, Esquire, counsel for Mr. Smith, filed his pretrial statement and served respondent with a copy.

(74) The master's hearing was held on April 16, 1999, at which time, inter alia:

(a) Respondent filed a pretrial statement on behalf of Mrs. Smith.

(b) Respondent advised Mrs. Smith to execute an agreement pursuant to which, inter alia: she was to receive title to marital real estate; she would receive $650 from her husband's pension benefits; and counsel was to prepare a qualified domestic relations order (QDRO) effectuating the latter provision and submit it to Mr. Smith's pension plan for approval and then to the court.

(c) Based upon her discussion with respondent, Mrs. Smith believed that after she received her last support check in June, she would start receiving regular alimony checks, as well as payment of arrearages.

(d) In reliance upon her understanding of respondent's advice, Mrs. Smith executed the agreement.

(75) By letter dated April 18, 1998, respondent confirmed a conversation with Mrs. Smith of that date relating to the agreement and confirmed that Mrs. Smith had directed her to pursue the issue of back support.

(76) On April 20, 1999, a decree and order were entered granting the divorce and incorporating the property settlement agreement.

(77) Thereafter, Mrs. Smith came to believe that Mr. Smith had more assets than he had disclosed in the divorce proceedings.

(78) Mrs. Smith so advised respondent, who advised Mrs. Smith that she would move to reopen the divorce.

(79) Respondent sent to Mrs. Smith a billing statement dated April 1999 which reflected a balance due of $572.50.

(80) Thereafter, on several occasions Mr. Masciantonio called and wrote to respondent in an effort to complete the documentation required by the divorce agreement, including:

(a) a letter dated May 6, 1999, requesting that respondent forward a deed conveying the marital real estate from his client to hers, so that he could have the deed executed by his client, and also asked if the QDRO he had sent to respondent was satisfactory, so that he could forward it to Mr. Smith's union, the Teamsters; and

(b) a letter dated May 17, 1999, forwarding the original QDRO signed by Mr. Smith and himself and requested that she return the order with her signature and that of Mrs. Smith so that he could file it with the court.

(81) Respondent did not respond to these letters respondent and to provide the documents requested.

(82) By letter dated May 18, 1998, respondent advised Mrs. Smith that:

(a) she had prepared and was "filing with the court a petition to vacate/open the decree and order (which included the property settlement agreement)," as well as an appeal to the Superior Court of Pennsylvania;

(b) Mrs. Smith should provide documents supporting her claims;

(c) Mr. Smith had executed the necessary papers to transfer the property, and Mrs. Smith should provide a deed to complete the transfer; and

(d) Respondent had requested a print-out of payments to Mrs. Smith with regard to the back support issue.

(83) Thereafter, respondent ceased communicating with Mrs. Smith and was not available when Mrs. Smith visited her office on numerous occasions between April and November 1999.

(84) On May 19, 1999, respondent filed a petition to open the decree, without a certificate of service.

(85) Respondent failed to serve the petition to open on Mr. Masciantonio, as required by Pa.R.C.P. 440 (a)(1).

(86) On June 4, 1999, respondent filed a notice of appeal of the entry of the divorce decree in the Superior Court.

(a) The appeal was untimely, in that the final decree in divorce had been entered more than 30 days before the appeal was filed.

(b) Respondent failed to serve a copy of the notice of appeal on Mr. Masciantonio as required by Pa.R.A.P.

121(b), and to file proof of service as required by Pa.R.A.P 121(d).

(87) On June 9, 1999, the trial court entered a rule to show cause why the petition to open divorce decree should not be granted, returnable July 14, 1999.

(a) Mrs. Smith was notified of that date and contacted respondent.

(b) Respondent advised Mrs. Smith that she would request another date.

(88) In June 1999, Mrs. Smith received her final support check.

(a) Mrs. Smith did not receive any alimony payments or payments on account of arrearages.

(b) Thereafter, Mrs. Smith attempted to reach respondent by calling and visiting her office, but she was unable to locate respondent or obtain any response.

(89) By letter dated June 15, 1999, Mr. Masciantonio advised respondent that he had just received a notice of appeal docket from the Superior Court, that he had not received prior notice of the appeal, and that respondent should withdraw it as the appeal was frivolous.

(90) Respondent failed to appear at the hearing on July 14, 1999, on the petition to reopen, to take action to seek another date or otherwise pursue the matter.

(91) By order dated July 14, 1999, the petition was dismissed without prejudice for lack of prosecution.

(a) Respondent took no further action to pursue the petition to reopen.

(92) By letter dated June 30, 1999, to counsel for the Teamsters Pension Trust Fund, copied to respondent, Mr.

Masciantonio forwarded information relating to the QDRO and stated, inter alia, that his client had executed a deed for the transfer of the marital real estate and that his portion of the pension should be paid to him.

(a) By letter dated July 2, 1999, Teamster's counsel asked that respondent advise of her position with respect to the aforementioned letter.

(b) Respondent did not respond to that letter.

(93) Mr. Masciantonio prepared a deed to transfer the property from his client to Mrs. Smith.

(94) By letter dated August 3, 1999, Mr. Masciantonio forwarded to respondent a copy of a motion to dismiss appeal which he filed on that date in the Superior Court.

(95) Respondent did not respond to the motion to dismiss.

(96) By certified letter dated August 30, 1999, received by respondent's agent on August 31, Mrs. Smith asked that respondent release her file

(97) Respondent failed to respond to that letter and to release the file.

(98) By order dated September 17, 1999, the Superior Court granted Mr. Masciantonio's motion to dismiss the appeal.

(99) Respondent failed to so advise Mrs. Smith.

(100) Mrs. Smith retained Bella Schnall, Esquire, to represent her in matters relating to her divorce and support.

(a) Between August and mid-October 1999, Ms. Schnall wrote to respondent, called and visited respondent's office on numerous occasions and left messages

requesting that respondent contact her to arrange to make Mrs. Smith's file available to her for review.

(b) Respondent did not make such arrangements with Ms. Schnall.

(101) On November 8, 1999, a signed QDRO was filed by Mr. Masciantonio and transmitted to the court.

(102) By certified letter dated November 18, 1999, signed for by respondent's agent on November 22, Mrs. Smith asked that respondent release the file to her by December 5, 1999.

(103) Respondent failed to release the file.

*Charge V: Registration Violations*

(104) By order of the Supreme Court of New Jersey dated March 15, 1999, respondent was temporarily suspended from the bar of that state for failure to satisfy an award of a District Fee Arbitration Committee.

(105) The clerk of the Supreme Court of New Jersey sent notice of the entry of that order to respondent by regular and certified mail addressed to her home address.

(106) Respondent failed to advise the Disciplinary Board of the Supreme Court of Pennsylvania of her suspension, as required by Pa.R.D.E. 219(d)(3).

(107) On June 29, 1999, respondent signed her 1999-2000 Pennsylvania Attorney's Annual Fee Form as required by Pa.R.D.E. 219(d) and submitted it to the Administrative Office of the Disciplinary Board of the Supreme Court of Pennsylvania.

(a) In the form, she stated that her New Jersey Bar status was "inactive."

(b) That statement was false.

(108) By D.B.-7 letter dated December 8, 1999, respondent was notified of allegations of possible violations of the Rules of Professional Conduct arising from the foregoing facts.

(109) On or about June 28, 2000, respondent signed her 2000-2001 Pennsylvania Attorney's Annual Fee Form and submitted it to the Administrative Office of the Disciplinary Board.

(a) In the form, she stated that her New Jersey Bar status was "inactive."

(b) That statement was false.

*Further Findings*

(110) Respondent has been sued in malpractice on two occasions during the past 10 years:

(a) *Cheryl Washington v. Susan Bolno,* Phila. CCP 990500536:

(i) In 1997, respondent filed a personal injury action for Ms. Washington, for which respondent failed to appear for arbitration, as a result of which an award was entered for defendants.

(ii) Ms. Washington filed a legal malpractice action against respondent in May 1999.

(iii) A petition for alternative service of the malpractice action was filed due to respondent's failure to accept service.

(iv) The complaint was filed on September 27, 1999. Respondent did not answer the complaint.

(v) The case was settled and payment made by the malpractice carrier of Fox & Fox.

(b) *Evelyn Holman v. Susan Bolno, Esquire,* Phila. CCP no. 0103020901:

(i) In 1997, respondent filed a personal injury action for Ms. Holman, for which respondent failed to appear for arbitration, as a result of which an award was entered for defendants.

(ii) A complaint in legal malpractice was filed against respondent on behalf of Ms. Holman on May 3, 2001.

(iii) Respondent has not answered the complaint.

(iv) The case is scheduled for arbitration on November 16, 2001.

(111) Respondent was advised of allegations of possible violations of the Rules of Professional Conduct in the matters which are the subjects of Charges I-IV above, by letter requests for statement of respondent's position (Form D.B.-7) as follows: Warman: May 19 and June 19, 1999; Law: March 2, 2000; Rosa: November 20, 1998; Smith: January 10, 2000; Registration matter: December 8, 1999 and May 18, 2000.

(a) Respondent did not answer any of those letters.

(b) In July 1999, petitioner contacted respondent, who advised that she had not received those letters.

(c) On July 12, 1999, respondent picked up copies of the D.B.-7s from petitioner.

(d) By facsimile dated July 18, 1999, respondent advised petitioner that she would respond by July 22, 1999.

(e) Respondent did not respond to the D.B.-7s.

(112) Respondent was diagnosed with Hepatitis C in November 1998, was treated for the disease, and as of no later than March 2001, was in remission.

(113) Respondent has not contacted her former client, Julie Warman, to determine if she ever received the $15,000 settlement which respondent had neglected to consummate for her.

(114) Respondent has not compensated her former client, Michelle Nissenbaum Law, for the amount of interest that was lost due to respondent's failure to distribute her escrowed funds to her promptly.

(115) Respondent has not returned to her former client, Jacinto A. Rosa, the unearned retainer in the amount of $1,500, which he paid her to secure the divorce which respondent never secured for him.

(116) Respondent has not paid the fee award which caused her to be suspended from the practice of law in New Jersey.

(117) Respondent does not practice in association with any other attorney and she does not have a practice monitor. The pattern of neglect to which respondent has stipulated began around the time she left the firm she was practicing with to open her own practice. Respondent went out on her own in 1993; the Warmans were referred to her in July 1993.

(118) Respondent has no history of discipline.

### III. CONCLUSIONS OF LAW

By her actions as set forth above, respondent violated the following Rules of Professional Conduct and Rules of Disciplinary Enforcement:

(1) R.P.C. 1.1—A lawyer shall provide competent representation to a client.

(2) R.P.C. 1.3—A lawyer shall act with reasonable diligence and promptness in representing a client.

(3) R.P.C. 1.4(a)—A lawyer shall keep a client informed about the status of a matter and promptly comply with reasonable requests for information.

(4) R.P.C. 1.4(b)—A lawyer shall explain a matter to the extent necessary to permit the client to make informed decisions regarding the representation.

(5) R.P.C. 1.5(c)—Upon conclusion of a contingent fee matter the lawyer shall provide the client with a written statement stating the outcome of the matter and, if there is a recovery, showing the remittance to the client and the method of its determination.

(6) R.P.C. 1.15(b)—A lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property.

(7) R.P.C. 1.16(d)—Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interest.

(8) R.P.C. 3.1—A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous.

(9) R.P.C. 3.2—A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client.

(10) R.P.C. 4.1(a)—In the course of representing a client a lawyer shall not knowingly make a false statement of material fact or law to a third person.

(11) R.P.C. 8.4(c)—It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud deceit or misrepresentation.

(12) Pa.R.D.E. 203(b)(3)—Willful violation of any other provision of the enforcement rules.

(13) Pa.R.D.E. 219(d)(1)(i)—Annual statement shall set forth the jurisdictions in which the person has ever been licensed to practice law, with the current status thereof.

(14) Pa.R.D.E. 219(d)(3)—Every person who has filed such a statement shall notify the administrative office in writing of any change in the information previously submitted within 30 days after such change.

## IV. DISCUSSION

This matter is before the Disciplinary Board on a petition for discipline charging respondent with misconduct in four client matters and misstatements on her Pennsylvania attorney annual registration form. Respondent admitted to the misconduct and stipulated to the facts alleged by petitioner. Respondent also stipulated to all of the rules violations charged by petitioner, except for R.P.C. 8.4(c).

Upon examination of the evidence, the Hearing Committee concluded that respondent did violate R.P.C. 8.4(c), as she misrepresented the status of cases to her clients and created documents to perpetuate the misrepresentations. Respondent was well aware of her actions at the time she took them. Respondent's intentional misstatements on her attorney registration form that she was "inactive" in New Jersey, rather than suspended, also

support a finding that she violated Rule 8.4(c). The board agrees with the committee's findings and draws the same conclusion that respondent did engage in dishonest conduct violative of Rule 8.4(c).

The board must now determine the appropriate sanction to address respondent's conduct. For seven years, respondent engaged in a pattern of accepting cases, providing minimal initial services, and then permitting the files to languish. She did not communicate with her clients or other counsel and ignored court orders to the detriment of her clients' cases. Respondent went so far as to make misrepresentations and fabricate letters to cover her neglect. Respondent's ability to ignore her responsibilities extended to her initial involvement in the disciplinary system, when she ignored the Form D.B.-7s she received in four of the matters described above. Respondent did not make restitution to her injured clients for the harm she caused them. It is clear that respondent engaged in serious professional misconduct.

Respondent explained that she neglected the affairs of her clients because she was having problems coping with issues both personal and professional and was not able to effectively make decisions to resolve these problems. Respondent characterizes herself during the time period of the misconduct as indecisive and fearful of making a mistake. In addition to her professional difficulties, respondent was diagnosed with Hepatitis C in 1998 and began treatment in 1999. The treatment ended in 2000. Respondent experienced side effects such as exhaustion, depression and significant hair loss during the treatment. She was also enmeshed in a difficult divorce which became final in 2000. Respondent's difficulties do not meet

the standard set forth in *Office of Disciplinary Counsel v. Braun,* 520 Pa. 157, 553 A.2d 894 (1989), to entitle her to mitigation. In *Braun,* the Supreme Court held that a respondent's psychiatric condition may mitigate the discipline where the respondent proves that the condition was a causal factor in the professional misconduct. The evidence offered by respondent is not sufficient to meet this standard, nor does respondent attempt to argue that it is.

The Hearing Committee recommended that respondent be suspended for a period of six months followed by a probation period of six months. This recommendation does not give adequate weight to the extent of respondent's misconduct. In light of the seriousness of her actions, the board is persuaded that a suspension of one year and one day is the appropriate sanction. While it is true that this is respondent's first encounter with the disciplinary system and she has shown remorse, her misconduct is troublesome. Respondent was unable to take even simple steps to resolve matters for the benefit of her clients. Respondent testified that she decided to seek psychiatric treatment after Office of Disciplinary Counsel became involved. At the time of the disciplinary hearing, she had attended four sessions with a Dr. Kevin Hails. Respondent's instinct to get help is certainly appropriate, as her personal problems are unquestionably challenging, and it is the board's opinion that respondent needs time to sort out the issues with her practice and to then prove at a reinstatement hearing that she is fit to practice law.

The case law supports a suspension of one year and one day. Recent cases involving a pattern of neglect and

misrepresentation have resulted in suspensions of one year and one day. *In re Anonymous No. 73 D.B. 99,* no. 685 Disciplinary Docket no. 3 (Pa. April 2, 2001); *In re Anonymous no. 91 D.B. 90,* 14 D.&C.4th 597 (1992). A suspension of this duration effectively serves to protect the public and to reflect the gravity of the misconduct in which respondent engaged.

## V. RECOMMENDATION

The Disciplinary Board of the Supreme Court of Pennsylvania unanimously recommends that respondent, Susan Bell Bolno, be suspended from the practice of law for a period of one year and one day.

It is further recommended that the expenses incurred in the investigation and prosecution of this matter be paid by respondent.

Board Members Sheerer and Peck recused themselves in this matter.

Board Members Schultz and McLaughlin did not participate in the June 12, 2002 adjudication.

## ORDER

And now, March 7, 2003, upon consideration of the report and recommendations of the Disciplinary Board dated December 16, 2002, it is hereby ordered that Susan Bell Bolno be and she is suspended from the bar of this Commonwealth for a period of two years, and she shall comply with all the provisions of Rule 217, Pa.R.D.E. It is further ordered that respondent shall pay costs to the Disciplinary Board pursuant to Rule 208(g), Pa.R.D.E.